## STIMSON TRACTOR COMPANY *v.* Allen HEFLIN

74-140                                                     516 S.W. 2d 379

### Opinion delivered December 2, 1974

*Gill, Clayton & Johnson,* for appellant.

*Gaughan, Barnes, Roberts, Harrell & Laney,* for appellee.

CARLETON HARRIS, Chief Justice. Appellant, Stimson Tractor Company, an Arkansas corporation engaged in selling Allis Chalmers farm equipment in Dumas, sold a new FR Allis Chalmers Gleaner Combine to Allen Heflin, appellee herein, pursuant to the terms of a security agreement. The purchase price was $20,115.21, the down payment being $5,-115.21, and the balance of $15,000 due in installments spread over a four year period. Actually, the down payment consisted of a trade-in of $7,184.74 on an older C2 Allis Chalmers Combine which belonged to appellee, less a balance still due on that machine of $2,069.53. Delivery was made around the first of September, 1971. Heflin did not make the

first payment due on December 1, 1971, and appellant, after accepting reassignment from Allis Chalmers, picked up the Combine and sold it at public sale on October 11, 1972 for $10,000. The parties stipulated that the requirements of the Uniform Commercial Code were complied with by appellant relative to the recovery of the combine, notice of sale, and the subsequent sale. Thereafter, appellant instituted suit for a deficiency of $5,418.35 (including all costs of the sale), and Heflin answered and counter-claimed, asserting a breach of warranty of fitness for the purpose for which the machine was sought, and asked for damages in the amount of his down payment. The counterclaim, after stipulation, included an allegation that appellant had breached an implied warranty of merchantability. Appellant's complaint was treated as amended to include an assertion of contractual limitation of the warranty of fitness for a particular purpose, and also an allegation that Heflin was precluded from asserting a breach of warranty by virtue of using the combine to harvest 200 acres of soybeans and approximately 60 acres of clover and Bahia grass. After stipulating that the combine was properly recovered and disposed of and agreeing that appellant's Retail Installment Contract could be introduced, appellee assumed the burden of going forward with his evidence. At the close of this evidence, appellant moved for a directed verdict, which was denied; appellant then introduced witnesses and at the conclusion of all evidence again moved for a directed verdict. The court again denied the motion and submitted the case to the jury, which returned a nine to three verdict for Heflin in the amount of $5,115.21. From the judgment entered in accord with this verdict, appellant brings this appeal.

Heflin's testimony detailed unsatisfactory performance of the machine, according to appellee, almost from the time he started using it, the witness mentioning a bent shaft and a burned out bearing. He stated, however, that the company fixed the shaft and put in another bearing. Heflin said that he started combining clover but the machine drew too much foliage into it and the chain broke. He fixed it, but a belt broke and the company replaced the belt. Appellee said that he didn't combine over 40 or 50 acres of Bahia with the combine and he next used it to combine beans, but that it picked up a chunk of wood, which twisted the auger. He mentioned

several instances of chunks being picked up, which would "strip the bolts" but he fixed the machine and combined 100 acres, combined a field for a neighbor, but constantly had trouble with the machine picking up too much foliage. Heflin said the machine wouldn't "do the job, *** just wasn't performing like it should — broke down too much." However, he said that he got out most of his crop.[1] His complaints could be summarized as stating that the machine "broke down" in the clover; "broke down" in the Bahia grass and "broke down" in the soybeans three times.

Company employees testified that appellee reported only two problems to the company, *viz.*, a broken belt, and a burned out bearing due to heavy foliage, which were promptly repaired. This evidence was not disputed by appellee, who stated that either he repaired the machine or the company repaired it on all occasions, and he agreed that the complaints made were not attributable to the mechanism of the machine itself, but were due to its picking up heavy foliage and chunks. Of course, it is manifest that these repairs were only minor, else Heflin could not have made some of the repairs himself.

An important fact is that the proof does not reflect that appellee was induced, or persuaded, by any assurances of appellant to purchase the combine; rather, the record clearly reflects that Heflin picked out the combine himself. The evidence shows that Heflin made two trips to the company office, desiring to purchase an FR combine, a different model from the C-2 traded in by appellee. Heflin testified that he realized it was different, and he said that company officials, on the first visit, told him that he lived so far away that service would be difficult, the witness further stating that he was told that Stimson was in the hospital and that his permission would have to be obtained to make the sale. On the second

---

[1] From the record:

"Q. All right, let me summarize then. Did you get your crop that year?·

A. Most of it, just part of it. I didn't get it all.

Q. All right, how much in total do you think that you combined that year with that combine?

A. Around two hundred acres."

trip, permission was obtained from Stimson, and at that point it was sold. Heflin testified that he had farmed all of his life, and, under the evidence just mentioned, there was certainly no pressure on him to purchase the machine.

Heflin's criticisms of the combine related to the fact that there was no slip clutch, no throw out switch, and that the machine was chain driven, rather than belt driven. We reiterate that these were facts known to Heflin when the purchase was made, Heflin agreeing that he knew the combine was chain driven, and further stating that he was not told that it had a slip clutch. From the record:

> "They said they'd put slip belts on it, put belts on it that would slip, and I told-Well, I didn't tell them whether I'd take it or not and he said he'd come paint the cab. He did say that, but I just-I just wasn't satisfied with the combine, so I let them have it back."

The evidence reflected that to convert to a belt from a chain would have cost approximately $30.00, and Heflin was apprised of that fact.

Ark. Stat. Ann. § 85-2-608 (Add. 1961) sets out the grounds for revocation of acceptance in whole or in part. That section reads as follows:

> "(1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it
>
> (a) on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or
>
> (b) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.
>
> (2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have

discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them."

The proof on the part of appellee does not reflect there was any defect to be cured for he knew, as previously pointed out, when picking out the machine, that it was different from the combine he was then operating. Certainly, there was nothing to prevent this experienced farmer, who examined the machine, from being thoroughly acquainted with it, and as already stated, there were absolutely no assurances from the seller. But, even if defects had been shown, or there had been testimony of the seller's assurances that any defects that existed would be corrected, still, there must have been a revocation of appellee's acceptance of the machine within a reasonable time after he discovered such defects. This brings us to the evidence in that regard.

Heflin testified that he notified appellant about November 20, 1971, that he did not want the combine and the company should pick it up. He stated that on January 5, 1972, he again told the company to pick up the machine. However, this testimony is clearly contradictory to later statements made by appellee, Heflin admitting that he told company representatives in January (after the two notices he said he had given the company) that he had not then decided whether or not he would keep the machine. Not only that, but Heflin, in April, 1972, while the combine was still in his possession, offered to pay $10,000 for it. It follows from what has been said that Stimson was entitled to recover the purchase price since there was no revocation within a reasonable time, and no proof in this record of a breach of warranty; the court should have granted a directed verdict for appellant.

However, this is not to say that Heflin cannot recover damages for breach of warranty. Comment 1 to Ark. Stat. Ann. § 85-2-608 (Add. 1961) points out that a buyer is no

longer required to elect between revocation of acceptance and recovery of damages for breach. Both are available to him, and accordingly, Heflin may still have a right to recover money damages provided he establishes a breach of warranty on remand of the case. Under Ark. Stat. Ann. § 85-2-607 (3) (a) and (4) (Add. 1961), the buyer is charged with the responsibility of giving notice of the alleged breach to the seller, and, of course, the burden of proof rests upon him. The type of damages to which Heflin might be entitled is set out in Ark. Stat. Ann. § 85-2-714 (Add. 1961). It would not appear that appellee is entitled to damages under Ark. Stat. Ann. § 85-2-715 (1) (Add. 1961) (incidental damages), since Heflin accepted the goods and, as pointed out, appellee did not establish revocation of his acceptance. Subsection (2) allows the buyer in appropriate circumstances to recover consequential damages.

We recognize that to permit Heflin to now seek damages for breach of warranty is contrary to our holding in *Hudspeth Motors v. Wilkinson*, 238 Ark. 410, 382 S.W. 2d 191, where this court held that there was no rejection or revocation by the buyer and we thus remanded the case for entry of a judgment in favor of the seller. *Hudspeth* was decided during the early years after the Uniform Commercial Code became effective in this State, and we were without benefit of briefs from both parties, only appellant submitting an abstract and a brief. We have now concluded, under the authority of the statutes cited in the previous paragraph, that this holding was in error and accordingly *Hudspeth* is overruled to the extent that the Circuit Court was directed to enter judgment for Hudspeth without first giving Wilkinson the opportunity to show damages for breach of warranty.

In the case before us, we are unable to say that on a retrial the evidence could not be more fully developed wherein it could be shown that appellee would be entitled to damages because the machine failed to perform its designed function of harvesting crops.

Reversed and Remanded.

JONES, BYRD, and HOLT, JJ., dissent.

CONLEY BRD, Justice, dissenting. I disagree with the majority that the appellee has failed to prove a defect in the FR Combine that he purchased. It may be that the majority's trouble is that they do not comprehend the weather conditions during combining season. However, I think everybody should take judicial knowledge of the fact that soy beans are generally harvested from the latter part of October through the early part of December — the record shows that this was the time that Mr. Heflin was attempting to use the combine involved. During that time of the year the days are short, there is much rain and heavy dew caused by the cold nights and heavy humidity. A combine will not work when the beans are wet with dew — appellant's witness Billy Cruse admits as much when he discussed the reason for the variable speed fan on the combine. Thus with a short time in which to gather beans because of the inclement weather and the short work days caused by heavy dew, any breakdown of a combine materially interrupts the harvest of the bean crop.

Another fact that the majority seemingly overlooks is that the combine delivered, although purchased in 1971, had apparently been on appellant's lot for some time since the cab was rusty and the drive belt was weather beaten. Heflin testified that appellant did not deliver the combine that he looked at when he made his purchase — this fact was controverted by appellant's salesman Mr. William · but of course in reviewing the evidence we are supposed to ta    that view of the evidence most favorable to the jury's verdict.

With respect to the operation of the particular combine that was delivered, the proof is undisputed that it would lock down if a chunk should happen not to be lined up properly when it went into the combine. It is conceded by all witnesses that a small chunk did lock the combine down and that in so doing it bent the main auger flight. Appellant contended throughout that its warranty did not cover the cost of repairing the bent auger flight.

With respect to the operation of the combine Heflin testified that it choked down in combining clover, Bahia grass and soy beans. With reference to the combine's performance in the harvesting of soy beans he testified:

"Q. All right, and would you explain that to the jury and what occurred?

A. Well, I started combining beans. I worked about an hour and I picked up a little old chunk. It wasn't as big as a quart fruit jar and it twisted my auger, the big auger that pulls foliage into the combine, and I had to take the combine to a neighbor's house there and take the auger completely out of it and replace the bolts. They had stripped out. After it got that chunk, well, it couldn't pull it through and it stripped the bolts out of the end of the auger.

Q. What? Just broke down?

A. Yes, sir.

Q. All right, sir, then what did you do?

A. Well, I got started the next day and went back out there and combined about three or four hours and I picked up another little old chunk. Of course, we've got a lot of little old chunks in this country. And it stripped the bolts out again.

Q. All right, broke down again?

A. Yes, sir.

Q. Then what did you do?

A. I had to take it in and fix it at the same place and I got that fixed and I went on and combined for, I'd say, a hundred acres.

Q. All right, sir, a hundred acres. Then what occurred?

A. I picked up too much foliage in another man's field.

Q. Where did you go? Did you finish this combining?

A. I finished that field, yes, sir.

Q. Then where did you go?

A. I went to a man over close to Hampton, Lucian Goodwin.

Q. Allright, sir, what did you do there?

A. He had a hundred acres of beans I was combining and it picked up too much foliage and it stripped them bolts again. I was down another day."

Mr. Heflin testified that the chunks in his field were comparable to the fields in the area and that the smaller Allis-Chalmers combine that he traded in on the one in question performed satisfactorily.

Appellant's witness Billy Cruse who explained that none of the Allis-Chalmers combines have ever had an auger slip clutch on the header then testified as follows:

"Q. Let me direct you for a second. Does FR—Does a 1971 FR, does it have a slip chain drive on it?

A. From the factory."

It's true that in discussing the cost for Mr. Heflin to change from a chain drive to a belt drive that Billy Cruse first stated: "He would have had to have purchased two pulleys and one belt, approximately $30.00 or something or another in this range." In subsequent examination by the same witness the following occured:

"Q. No, sir, there's been testimony about a belt breaking due to weather, for instance, to wear due to weather.

A. After you once replaced a weathered belt you should have the equivalent to a new machine.

Q. Would you compare it to the fan belt on a automobile?

A. Yes, anything can weather. Their belts, I mean, it would be compared to a fan belt.

Q. What's the cost of a belt?

A. *They vary widely. Fan belts on them would be maybe $2.50, where the engine drive belt would be $85 or $90, anywhere in that range.* [Emphasis mine.]

Appellant's shop foreman testified that it would take $250 to replace the bent auger flight.

Thus we can see from the foregoing testimony that a 1971 model FR combine had a "slip chain drive on it" to protect the auger and prevent the break-downs of which appellee complained. There is testimony from which the jury could have found that appellant did not deliver a 1971 model machine and certainly not the machine at which appellee looked in making the purchase. Furthermore, there is ample testimony that it took a whole day to repair the combine in question after it "locked down" on a chunk. Of course nobody would want a passenger automobile if it got bent every time they had a flat and it took all day to repair the same — I don't think any equipment company should expect a farmer to spend all day repairing his combine after picking up a chunk that would ordinarily go through and be automatically ejected — obviously Allis-Chalmers does not expect to sell them to farmers because it installed the "slip chain drive" on the 1971 models.

Finally the majority take Mr. Heflin's testimony completely out of context and state that he did not properly revoke his acceptance of the combine within the purview of the Uniform Commercial Code. It must be remembered that not only did appellant's witness Williams understand that Heflin had revoked his acceptance but Heflin had already written a letter to Allis-Chalmers notifying them to come and get the combine. Furthermore, it must be remembered that the statement was made by a man with no formal education and to appellant's agents when they were trying to get Heflin to reconsider and keep the machine. Furthermore Heflin also testified with reference to contact by Cruse and Manes on January 7th as follows:

"Q. All right, now I'm going to ask you what, if any, additional or other contact you had with anybody at Stim-

son or Allis-Chalmers that you remember?

A. Well, they came over. I don't know what month it was. And tried to get me to keep the combine and I told them I didn't want it.

Q. Do you know who came over?

A. I can't think of his name. It was a salesman from Mississippi.

Q. Okay, fine."

In all of the appeals that have been before this court we have heretofore considered the evidence in the light most favorable to the jury's finding. When we view this record from that view point there is obviously ample evidence to sustain the jury's finding. To do otherwise we must consider the evidence out of context and most strongly against the person in whose favor the jury made its findings.

Therefore, I respectfully dissent.(¹)

HOLT, J., joins in this dissent.

(¹)In my disposition of this case I do not reach the issue with respect to *Hudspeth Motors* v. *Wilkinson*, 238 Ark. 410, 382 S.W. 2d 191 (1964), but if I did I would agree that it should be overruled.